Nos. 12-2853, 12-3142 & 12-3143

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

---

SIERRA CLUB,

*Petitioner*,

v

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY, ET AL.,

*Respondents.*

---

PETITION FOR REVIEW OF FINAL AGENCY ACTION OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

---

# PETITIONER'S REPLY BRIEF

---

Sanjay Narayan
Sierra Club
Environmental Law Program
85 Second Street, 2d Floor
San Francisco, CA 94105
(415) 977-5769
sanjay.narayan@sierraclub.org

David C. Bender
McGillivray Westerberg
& Bender LLC
211 S. Paterson St., Suite 320
Madison, WI 53703
(608) 310-3560
bender@mwbattorneys.com

Robert Ukeiley
Law Office of Robert Ukeiley
255 Mountain Meadows Rd.
Boulder, CO 80302
(303) 442-4033
rukeiley@igc.org

*Attorneys for Petitioner, Sierra Club*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

Table of Contents .......... i

Table of Authorities .......... iii

I. Introduction .......... 1

II. Sierra Club Has Standing .......... 5

*A. Sierra Club Has Standing, Though the Areas Attained the Standard Before Re-designation.* .......... 7

*B. The Maintenance Plans Do Not Cure Sierra Club's Injuries.* .......... 9

*C. St. Louis' and Chicago's Designations Under the 2008 Ozone Standard Do Not Eliminate Sierra Club's Ability to Challenge Those Areas' Re-Designations.* .......... 15

III. The Record Lacks a Determination that the Areas' Improved Air Quality Resulted from Permanent and Enforceable Measures .......... 17

*A. EPA Did Not Identify the Results of Permanent and Enforceable Measures in Milwaukee-Racine.* .......... 20

*B. EPA Never Determined the Ozone Levels Resulting from Permanent, Enforceable Measures in Milwaukee-Racine.* .......... 25

*C. EPA Could Not Assume that Observed Reductions in Milwaukee-Racine's Ozone Were Caused by Permanent, Enforceable Measures* .......... 28

*D. EPA Did Not Establish a Causal Connection When Re-designating Chicago or St. Louis.* .......... 31

IV. EPA Never Established That "Actual" Emissions Were Enforceable and Permanent. .......... 35

V. The NOx SIP Call Does Not Create Permanent And Enforceable Reductions in The Areas.......... 41

*A. The $NO_x$ SIP Call Was Relevant to Re-designation.* .......... *42*

*B. The $NO_x$ SIP Call Is Regional, Not Area-Specific.* .......... *43*

Certificate of compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements .......... 49

Certificate of Service

## TABLE OF AUTHORITIES

### Cases

*1000 Friends of Maryland v. Browner*,
265 F.3d 216 (4th Cir. 2001) .................... 10
*Abbott v. Lockheed Martin Corp.*,
725 F.3d 803 (7th Cir. 2013) *cert. denied*,
134 S. Ct. 826 (U.S. 2013) .................... 7, 12, 14
*Adventist GlenOaks Hosp. v. Sebelius*,
663 F.3d 939 (7th Cir. 2011) .................... 3, 30, 34
*Ass'n of Battery Recyclers v. EPA*,
716 F.3d 667 (D.C. Cir. 2013).................... 6
*Ass'n of Irritated Residents v. EPA*,
686 F.3d 668 (9th Cir. 2012) .................... 10
*Bagdonas v. Dep't of Treasury*,
93 F.3d 422 (7th Cir. 1996) .................... 38
*Bluewater Network v. EPA*,
370 F.3d 1 (D.C. Cir. 2004) .................... 1, 19, 27
*Burrage v. United States*,
134 S. Ct. 881 (2014) .................... 18
*Citizens Against Ruining the Env't v. EPA*,
535 F.3d 670 (7th Cir 2008) .................... 8
*EPA v. Homer City Generation, L.P.*,
134 S. Ct. 1584, (2014) .................... 44
*Fox Television Studios v. F.C.C.*,
280 F.3d 1027, *opinion modified on reh'g*,
293 F.3d 537 (D.C. Cir. 2002).................... 31
*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014) .................... 39
*Mainstreet Org. of Realtors v. Calumet City*,
505 F.3d 742 (7th Cir. 2007) .................... 9
*Michigan v. EPA*,
213 F.3d 663 (D.C. Cir. 2000).................... 41

**Cases (Cont'd)**

*Nat'l Fuel Gas Supply Corp. v. F.E.R.C.*,
468 F.3d 831 (D.C. Cir. 2006) .......... 35

*Natural Res. Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011) .......... 6, 16

*New York v. EPA*,
133 F.3d 987 (7th Cir. 1998) .......... 25, 26

*New York v. EPA*,
413 F.3d 3 (D.C. Cir. 2005) .......... 11

*North Carolina v. EPA*,
531 F.3d 896 (D.C. Cir. 2008) .......... 44, 45, 48

*NRDC v. EPA*,
571 F.3d 1245 (D.C. Cir. 2009) .......... 41, 45, 46

*Oklahoma Dep't of Envtl. Quality v. EPA*,
740 F.3d 185 (D.C. Cir. 2014) .......... 15

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007),
*aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008) .......... 13

*Radue v. Kimberly-Clark Corp.*,
219 F.3d 612 (7th Cir. 2000) .......... 2, 3, 29, 30

*Schane v. Int'l Bhd. of Teamsters Local No. 710 Pension Fund Plan*,
13-3745, 2014 WL 3611613 (7th Cir. July 23, 2014) .......... 27

*Sierra Club v. EPA*,
129 F.3d 137 (D.C. Cir. 1997) .......... 14, 15

*Sierra Club v. EPA*,
375 F.3d 537 (7th Cir. 2004) .......... 29

*Sierra Club v. EPA*,
699 F.3d 530 (D.C. Cir. 2012) .......... 7

*Sierra Club v. Franklin Cnty. Power of Illinois*,
546 F.3d 918 (7th Cir. 2008) .......... 7, 9

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014) .......... 37

## Federal Statutes

42 U.S.C. § 7407(d)(3)(E) .......... 47
42 U.S.C. § 7407(d)(3)(E)(i) .......... 46
42 U.S.C. § 7407(d)(3)(E)(iii) .......... passim
42 U.S.C. § 7411 .......... 22
42 U.S.C. § 7411(a)(b)(2) .......... 11
42 U.S.C. § 7412 .......... 23
42 U.S.C. § 7503 .......... 10
42 U.S.C. §§ 7503(a)-(b) .......... 10
42 U.S.C. § 7505a .......... 4, 37
42 U.S.C. § 7505a(d) .......... 14
42 U.S.C. § 7511a(a)(4) .......... 16
42 U.S.C. § 7511a(b)(5) .......... 10, 16

## Federal Register

63 Fed. Reg. 57,356 (Oct. 27, 1998) .......... 5, 41, 47
70 Fed. Reg. 69,085 (Nov. 14, 2005) .......... 46
71 Fed. Reg. 52,664 (Sept. 6, 2006) .......... 45
72 Fed. Reg. 27,425 (May 16, 2007) .......... 46
73 Fed. Reg. 16,436 (March 27, 2008) .......... 7, 15
75 Fed. Reg. 24,844 (May 6, 2010) .......... passim
75 Fed. Reg. 26,118 (May 11, 2010) .......... 45
76 Fed. Reg. 48,208 (Aug. 8, 2011) .......... 26, 44
77 Fed. Reg. 30,116 (May 21, 2012) .......... 16
77 Fed. Reg. 30,160 (May 21, 2012) .......... 16
77 Fed. Reg. 34,221 (June 11, 2012) .......... 16
78 Fed. Reg. 34,178 (June 6, 2013) .......... 16
79 Fed. Reg. 6,842 (Feb. 5, 2014) .......... 14

## Wisconsin Statutes and Rules

Wis. Admin. Code § NR428.05 .......... 22
Wis. Admin. Code § NR428.22(1) .......... 22

## I. Introduction

*1.* EPA accepts that the Clean Air Act demands, as a prerequisite to Milwaukee-Racine's, Chicago's, and St. Louis's re-designations, that the Agency "specifically determine" that the "improvement[s] in air quality" which brought those areas into attainment each "result[ed] from permanent and enforceable measures." Brief of Respondents ("Resp.") 37; 42 U.S.C. § 7407(d)(3)(E)(iii). EPA contends that it made that necessary causal connection, in its records of decision. *Id.* 30-40.

However – while EPA's decisions recite the statutory language – the rulemaking records lack any analysis or evidence that would permit EPA to reasonably conclude that the regulations the Agency cited caused these three areas' attainment of the ozone standard. *See Bluewater Network v. EPA,* 370 F.3d 1, 11 (D.C. Cir. 2004) (EPA must provide "rational connection between the facts found and the choice made") (citation omitted). EPA did not identify the effect of the "permanent and enforceable" measures it listed on precursor emissions within Milwaukee-Racine, Chicago, or St. Louis, during the period in which those areas' air quality improved to meet the standard. And even if it had, EPA did not determine the improvement in ozone levels

resulting from whatever precursor reductions might be attributable to those measures.

The only connection the Agency drew in the record was a correlation between: (1) the adoption of state and federal regulations; (2) a decrease in nitrogen oxides and volatile organics observed in Milwaukee-Racine, Chicago, and St. Louis by 2008; and (3) a simultaneous reduction in the areas' ozone levels. R.6, 16-7, 26. *See* R.17 (EPA "demonstrate[d] permanent and enforceable" reductions by "comparing" precursor emissions in 2005 and 2008, observing decrease in ozone to meet standard, and "identif[ying] a number of" adopted regulations). But that correlation does not establish causation; "other variables" intervene at each step between regulatory measures, reduced precursor emissions, and improved ozone levels. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616-17 (7th Cir. 2000).

Precursor reductions are not, in their entirety, the result of legal regulation; they also reflect impermanent, non-enforceable influences (*e.g.*, "adverse economic conditions," R.86). And ozone levels are not wholly determined by aggregate precursor "growth and reduction"; because weather, geography, and the presence of other precursors are

crucial influences, ozone pollution depends on when and where precursor reductions occur. 75 Fed. Reg. 24,844, 24,846 (May 6, 2010). The correlation relied upon by EPA in the record does not, therefore, rationally support EPA's ostensible conclusion: that the ozone reductions observed in the areas were caused by permanent and enforceable measures. *Radue,* 219 F.3d at 616-17. *See Adventist GlenOaks Hosp. v. Sebelius,* 663 F.3d 939, 942 (7th Cir. 2011) ("[A] decision is arbitrary and capricious if the agency ... entirely fails to consider an important aspect of the problem.").

*2.* The Agency acknowledges that it equated 'actual' 2008 emissions from large, stationary polluters with "permanent, enforceable reductions" from those sources. Resp. 48-9. It offers no reason why these emissions levels are either enforceable or permanent. Instead, EPA asserts that a different level – "maximum capacity at once" – would be a "gross overestimation." Resp. 49. EPA indicates nothing in the record to support its assertion. But even if true, that one other level (maximum capacity) is not 'permanent' does not make *this* level (2008 actual emissions) permanent or enforceable, any more than the difference between bananas and oranges allows one to equate apples with oranges.

EPA also introduces a new memorandum – the "Berry Memo," S.R. 1. That Memo, however, addresses a separate portion of the Act – governing 'maintenance' demonstrations,' *id.* – whose text does not demand 'permanent and enforceable' reductions. 42 U.S.C. § 7505a. The Berry Memo provides no insight into the re-designation requirements applicable here, 42 U.S.C. § 7407(d)(3)(E)(iii).

*3.* To avoid scrutiny of its conclusion that the regional '$NO_x$ SIP Call' trading program caused "permanent and enforceable" ozone reductions in Milwaukee-Racine, Chicago and St. Louis, R.7, 18, 25, the Agency now contends that it "merely" "cited," "noted generally," and "referenced" the program – disavowing any "rel[iance] on" the $NO_x$ SIP Call to produce the "reduction of ozone" necessary for the areas to meet the ozone standard, Resp. 60. That contention reveals the poverty of EPA's causal analysis. The Agency never determined the effect of *any* of the measures it 'mentioned' upon the areas' improved air quality, *e.g.* R.44-5. EPA now deploys that oversight (as it could with any of its 'cited' regulations) to sidestep enquiry into the permanency or enforceability of one such measure. Resp. 59-61.

In any event, EPA's decisions unequivocally stated that reductions from the $NO_x$ SIP Call were "relevant to" these re-designations. *E.g,* R.18. The Agency thus cannot escape review of its necessary conclusion that those reductions are "permanent and enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii). And the $NO_x$ SIP Call does not provide permanent, enforceable ozone reductions in any specific, local area. It creates only regional reductions in ozone precursors, which may occur anywhere within the program's 22-state trading region, and affect any one of thirteen different non-attainment areas. 63 Fed. Reg. 57,356, 57,395 (Oct. 27, 1998). While the program as a whole is enforceable, any benefits to Milwaukee-Racine, Chicago, or St. Louis are not – precluding EPA from relying on the program to render those areas' improved ozone levels "permanent and enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii).

## II. SIERRA CLUB HAS STANDING

EPA first seeks to avoid the above-described merits by contesting Sierra Club's standing. Resp. 27-30. Sierra Club members in Milwaukee-Racine, Chicago and St. Louis suffer "respiratory difficulties" when exposed to ozone, and reasonably curtail their

activities based upon their concerns regarding ozone pollution. Petitioners' Opening Brief ("Opening") 2 & n.2. These are "precisely the kinds of harms the Supreme Court has deemed sufficient to show injury in fact." *Ass'n of Battery Recyclers v. EPA,* 716 F.3d 667, 672-73 (D.C. Cir. 2013) (injury exists where "members aver that they live or work" in area subject to pollution "and have reduced their time outdoors in response to concerns about pollution") (citation omitted). The injury is traceable to EPA's decisions; the re-designations withdraw the regulatory requirements imposed by the Act on 'non-attainment' areas, and do so without providing permanent and enforceable measures to ensure air quality. *See* Opening 3-4. And Sierra Club's injury is redressable; vacatur would reinstate the Act's more stringent non-attainment requirements, and require Illinois and Wisconsin to furnish permanent, enforceable measures before escaping them. *See* Opening 4-5. *Natural Res. Def. Council v. EPA,* 643 F.3d 311, 318-19 (D.C. Cir. 2011) (standing exists where EPA's decisions will suspend "reduction[s] of ambient ozone," "eliminate[ a] … powerful incentive ... to reduce emissions," and vacatur would "require [the State] ... to submit" a compliant demonstration).

Standing does not require that "one know[] the ultimate magnitude" of the injury; it is enough that regulated sources "release some pollutants," and that Sierra Club's members reasonably "believe[] that these pollutants will ruin [their] ability to enjoy" the areas in which they live, work and recreate. *Sierra Club v. Franklin Cnty. Power of Illinois,* 546 F.3d 918, 927 (7th Cir. 2008). *See also Sierra Club v. EPA,* 699 F.3d 530, 534 (D.C. Cir. 2012) (decision need not increase pollution to create standing). Sierra Club has shown an "injury-in-fact that is fairly traceable to the defendant's conduct and that could likely be redressed by a favorable court decision." *Abbott v. Lockheed Martin Corp.,* 725 F.3d 803, 808 (7th Cir. 2013) *cert. denied*, 134 S. Ct. 826 (2013).

*A. Sierra Club Has Standing, Though the Areas Attained the Standard Before Re-designation.*

EPA implies that Sierra Club's injuries may be ignored, because the areas attained the ozone standard prior to EPA's re-designations. Resp. 31. But Sierra Club members' concerns regarding ozone pollution remain reasonable, and support standing, for two reasons. First, ozone pollution causes harm at concentrations below the 1997 standard (that is, below .084 ppm). 73 Fed. Reg. 16,436, 16,476 (March 27, 2008)

(noting relatively "certain evidence of adverse health effects" when ozone levels reach or exceed .080 ppm). And 'attainment' areas may experience air quality exceeding that concentration several times each year; EPA only deems areas 'non-attainment' if they have four lengthy periods of ozone pollution exceeding .084 ppm, for three consecutive years. Opening 17 n.6. & 22 n.8. *See* R.399 (noting ozone pollution exceeding .080 ppm several times yearly in Milwaukee-Racine).

Second, by re-designating these areas without first confirming that permanent, enforceable measures are in place, EPA's decisions make it much more likely that Sierra Club members will be exposed to dangerous ozone pollution after the re-designations. Concerns regarding such exposure are hardly speculative. Ozone levels in St. Louis have *already* risen to exceed the standard – despite the measures that EPA concluded would permanently and enforceably ensure attainment. No. 12-2853, Dkt. No. 17, Att.1.[1] Sheboygan County, subject to exactly the same 'measures' by which EPA re-designated Milwaukee-Racine, has also lapsed into non-attainment. R.11.

---

[1] Standing enquires are not limited to the administrative record. *Citizens Against Ruining the Env't v. EPA,* 535 F.3d 670, 675 (7th Cir 2008).

As this Court has recognized, an injury need not have already occurred to support standing; and "that a loss or harm on which a suit is based is probabilistic ... does not defeat standing." *Mainstreet Org. of Realtors v. Calumet City,* 505 F.3d 742, 744 (7th Cir. 2007) ("[S]tanding in the Article III sense does not require a certainty or even a very high probability" of injury, "as long as there is some nonnegligible, nontheoretical, probability of harm that the plaintiff's suit would redress."). Where an organizational member uses an area "affected" by pollution, and "likely exposure" to pollution in the future will "diminish [her] aesthetic and recreational" experience in that area, that injury is sufficient to provide standing. *Franklin Cnty. Power,* 546 F.3d at 925-26.

*B. The Maintenance Plans Do Not Cure Sierra Club's Injuries.*

EPA also claims that Sierra Club is uninjured because Wisconsin's and Illinois' "maintenance plans": (i) do not "relax any existing limits"; (ii) "demonstrate a decline in ozone precursor emissions"; and (iii)

include "contingency measures" to "correct" increases in ozone pollution. Resp. 27, 31.[2]

*(i)* But it is not true that EPA's re-designations "resulted in no relaxation of control requirements." Resp. 31. As moderate non-attainment areas, Milwaukee-Racine, Chicago, and St. Louis were subject to the Act's stringent 'non-attainment new source review' provisions. 42 U.S.C. § 7503. Those provisions demand, *inter alia*, that new and modified major sources of ozone-forming pollutants meet the "Lowest Achievable Emissions Rate," and purchase 'offsets' sufficient to decrease the areas' overall precursor emissions. 42 U.S.C. §§ 7503(a)-(b), 7511a(b)(5) (in "moderate" non-attainment areas, new and modified sources must ensure that 1.15 tons of pollution are eliminated for every ton produced by the new source).

---

[2] Courts have rebuffed similar EPA efforts to avoid scrutiny of one decision by pointing to another. *E.g., Ass'n of Irritated Residents v. EPA,* 686 F.3d 668, 678 (9th Cir. 2012) (where EPA fails to properly determine that implementation plan "has sufficiently enforceable commitments," and remand would "allow EPA to make that determination," EPA may not rely on plan to defeat standing); *1000 Friends of Maryland v. Browner,* 265 F.3d 216, 225-26 (4th Cir. 2001) (where EPA determines that existing measures result in area's attainment, and thereby "open[s] the door to the construction of ...projects" that will cause pollution, ozone-related injuries are traceable to that decision, regardless of contents of associated implementation plans).

EPA's re-designation removed those requirements, and the maintenance plans do not reproduce them. The re-designations substitute the less stringent provisions of the Act's "Prevention of Significant Deterioration" regime, which include neither offset nor "Lowest Achievable Emissions Rate" requirements. R.43, 60, 73 (relieving areas of "Part D" non-attainment new source review). *See generally New York v. EPA,* 413 F.3d 3, 12-13 (D.C. Cir. 2005) (describing differences between new source requirements in attainment areas, and "stricter" non-attainment requirements). Moreover, EPA's re-designation relieved Wisconsin of the obligation to impose 'reasonably available control technologies' on several categories of existing sources of ozone precursors in Milwaukee-Racine that it has not yet regulated, 42 U.S.C. § 7411(a)(b)(2)[3]; the maintenance plans include only the control measures that the State has already issued. R.125-6. *See also* R.39 (describing measures that would be required, but "no longer apply" as a result of re-designation (citation omitted)).

[3] Those categories are listed at http://www.epa.gov/air/urbanair/sipstatus/reports/wi_elembypoll.html#ozone-8hr__1997__687.

To the extent that the maintenance plans continue some existing control measures, they retain only those already-imposed measures that EPA cited in its re-designation decision, R.44 (describing Milwaukee-Racine measures), R.62, 77 ("many of the control programs that helped to bring [St. Louis] into attainment ... will continue"). Not "relax[ing]" those measures ameliorates Sierra Club's ozone-related injuries only if these measures do, in fact, ensure that ozone pollution remains below the standard – precisely the conclusion that Sierra Club here contests. Opening 28-45.

This petition challenges EPA's determination that the States' implementation plans (together with federal regulations), cause permanent, enforceable air quality improvements sufficient to attain the ozone standard. *See* Resp. 30. Opening 3-5. EPA asks this Court to deny standing by presuming this "claim has no merit," so that Sierra Club "has not been injured" – an "unworkable view of Article III standing." *Abbott,* 725 F.3d at 808-9 (refusing to conflate merits with Article III standing). "The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits" of a petitioner's claim. *Parker v.*

*District of Columbia,* 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008) (citation omitted). And if Sierra Club's claim is correct, the maintenance plans do not solve the areas' ozone-pollution problems merely by retaining the measures EPA cited in its re-designation decisions.

*(ii)* The maintenance plans' "demonstrat[ion]" of declining precursor emissions, Resp. 31, is similarly premised upon EPA's assumption that the adopted regulatory measures caused the areas' attainment. Each demonstration is based on a 'maintenance inventory.' R.127, 172, 324. By applying 'growth factors' to that inventory, the States sought to show that the areas would remain in attainment. R.128, 174, 326. But these showings are based entirely on the underlying inventory. And the inventory, in turn, is based entirely on the analysis of "permanent and enforceable" reductions which this petition contests. R.127 ("Attainment inventory" is demonstrated through analysis of permanent and enforceable measures), R.172 (combining inventory and analysis of permanent and enforceable measures), R.324-5 (same). In other words, the starting point for the maintenance plans' "demonstration" that they will sustain the areas' attainment is the Agency's assumption that

existing State and Federal measures were sufficient to cause the areas' attainment – which this petition disputes. R.46, 63, 77. *Abbott,* 725 F.3d at 808-9.

*(iii)* Finally, the plans' 'contingency measures' do not cure Sierra Club's injury. Resp. 27. Those 'contingency measures' prescribe no specific pollution reductions; they commit only to an "Evaluation of Additional Control Measures" – "if any." R.136-7. *Accord* R.182, 335. That equivocal half-promise does not render Sierra Club's injury speculative. *Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C. Cir. 1997) ("Even if alternative protective measures might limit the harm caused by the relaxation of regulatory provisions, the existence of alternative 'protective conditions' does not negate a party's standing to enforce statutorily mandated regulations.")

Moreover, even this contingent 'evaluation' will occur only after average ozone levels exceed the prescribed standard four times per year, for three consecutive years. R.136 (investigating measures only if "future ozone design value[s]" are ".085 ppm or higher"). *Accord* R.182, R.335. *See* 79 Fed. Reg. 6,842, 6,845 (Feb. 5, 2014) (describing 'design value'); 42 U.S.C. § 7505a(d). Those interim elevated ozone levels (and

additional ozone pollution before the measures take effect) concretely harm Sierra Club's members. 73 Fed. Reg. at 16,476 (noting harm when ozone levels reach or exceed .080 ppm). *See Oklahoma Dep't of Envtl. Quality v. EPA*, 740 F.3d 185, 190 (D.C. Cir. 2014) (injury not speculative where "relief under" alternative measures not "certain or complete").[4]

### *C. St. Louis' and Chicago's Designations Under the 2008 Ozone Standard Do Not Eliminate Sierra Club's Ability to Challenge Those Areas' Re-Designations.*

EPA suggests that because Chicago and St. Louis have been designated non-attainment under EPA's more recent ozone standard (issued in 2008, thus the "2008 ozone standard"), Sierra Club lacks standing to challenge those areas' re-designation under the 1997 ozone standard. Resp. 32. But while Chicago and St. Louis were designated as "moderate" non-attainment areas under the 1997 standard, they are designated "marginal" areas under the 2008 standard. 77 Fed. Reg.

[4] Milwaukee-Racine has not been designated non-attainment under any standard. EPA suggests that the possibility of non-attainment designation under the 2008 standard deprives this Court of jurisdiction to review its re-designation of Milwaukee-Racine. Resp. 33. That some non-attainment requirements *might* be reinstated in the future does not mitigate the injury resulting from EPA's removal of those requirements two years ago. *Sierra Club*, 129 F.3d at 139.

30,116, 30,130-31 (May 21, 2012). 77 Fed. Reg. 34,221, 34,227-28 (June 11, 2012). That lesser, 'marginal,' designation imposes milder regulatory requirements than those EPA removed by these re-designations. *See* 77 Fed. Reg. 30,160, 30,162 (May 21, 2012) (describing "fewer and/or less stringent mandatory air planning and control requirements" in marginal areas). For example, the 'moderate' non-attainment new source review requirements removed by the re-designations include an offset of 1.15 tons for every ton produced by a new or modified source. 42 U.S.C. § 7511a(b)(5). The 'marginal' new source requirements imposed pursuant to the 2008 standard will demand fewer reductions – 1.1 tons for every ton produced. 42 U.S.C. § 7511a(a)(4).

Additionally, EPA has not yet promulgated an implementation rule for the 2008 standard. *See* 78 Fed. Reg. 34,178 (June 6, 2013). EPA's designations under that standard have, consequently, remained largely without effect. *See Natural Res. Def. Council v. EPA,* 643 F.3d 311, 318 (D.C. Cir. 2011) (standing exists where EPA decision *"delay[s]* or suspend[s] future air quality improvements" (emphasis added)). EPA's designation of Chicago and St. Louis under its 2008 ozone standard

therefore does not nullify its re-designations of those areas under the 1997 standard.[5] *See also* R.3 ("Until the [1997 standard] is revoked, it remains in effect and independent of [the 2008 standard].").

## III. The Record Lacks a Determination that the Areas' Improved Air Quality Resulted from Permanent and Enforceable Measures

The Clean Air Act instructs EPA to determine that the "improvement in air quality" leading to re-designation "result[ed] from" "permanent and enforceable" measures. 42 U.S.C. § 7407(d)(3)(E)(iii). As in its decisions, EPA agrees that the Act thereby demands a showing of causation: the Agency must distinguish "'temporary' emission reductions from 'permanent and enforceable' reductions," Resp. 15, and confirm that the latter produce ozone levels sufficient to cause attainment of the standard, Resp. 37. R.6 (EPA must attribute "improvement in air quality necessary ... to attain" the standard to permanent and enforceable measures). *See Burrage v. United States,*

[5] EPA also complains that one of Sierra Club's members in St. Louis – Jack Norman – is affected by concern about harm to his family, rather than himself. Resp. 34. Even if this somehow rendered his concerns unreasonable, Mr. Norman is not the only declarant from St. Louis. Wegzryn Decl.¶¶ 1-2, 5-6. *See also* above at 5-17 ("[E]xplaining how this redesignation ... cause[s] additional pollution," affecting Ms. Wegzyrn, Resp. 35).

134 S. Ct. 881, 887 (2014) (Use of words "[r]esults from," in a statute, "imposes ... a requirement of actual causality").[6]

Accepting that necessary statutory interpretation, EPA insists that "the rulemaking record" contains the requisite "conclu[sion] that the reductions were due to [the] measures" that EPA cited as permanent and enforceable. Resp. 38-9. In support, however, EPA proffers only its decisions' conclusory recitations of the statutory language. *Id.* (citing R.7, 15, 17, 44, 61-3, 75-7). Those recitations – however often repeated – are not enough to uphold the Agency's decisions, unless the rulemaking records contain a satisfactory explanation of how, and why, the Agency reached the required conclusion: that Milwaukee-Racine's, Chicago's, and St. Louis's improved ozone levels "result[ed] from" permanent and enforceable measures. 42 U.S.C. § 7407(d)(3)(E)(iii). And the Agency's decision and record contain no analysis or evidence that rationally

---

[6] In its Statement, EPA asserts that "[t]he Act simply requires EPA to identify the emission reductions that have occurred as the result of permanent and enforceable measures." Resp. 6. If EPA means by that to claim that 42 U.S.C. § 7407(d)(e)(E)(iii) does not also require it to establish that such reductions "result[]" in "the improvement in air quality" allowing re-designation, *but see* Resp. 47 (acknowledging the opposite), it offers no argument to support that interpretation, nor could such an interpretation be reconciled with the text. Further, EPA did not, here, "identify" the ozone "reductions" resulting from the measures it cited. *See below,* at pp. 20-35.

attributes Milwaukee-Racine's improved ozone levels to state and federal regulations. *See Bluewater Network,* 370 F.3d at 21 ("[I]n order to determine whether [EPA's] decision reflects a 'rational connection between the facts found and the choice made,' a reasonable explanation of the specific analysis and evidence upon which the Agency relied is necessary." (citation omitted)).

EPA's decision and record establish only a correlation between reduced ozone levels, reduced precursor emission, and adopted regulations. Opening 43-57. That correlation is not sufficient to demonstrate that the areas' improved ozone levels resulted from the cited measures (and EPA does not meaningfully argue otherwise, Resp. 44). Opening 45-50. While the Agency now insists that it did more – invoking its "technical expertise" and "complex scientific data," Resp. 45-6 – it cites nothing in its decisions, or the record, indicating any further basis to connect the areas' improved ozone levels to the regulations that EPA "carefully listed." Resp. 40. And, as detailed below, the record contains no such analysis.

*A. EPA Did Not Identify the Results of Permanent and Enforceable Measures in Milwaukee-Racine.*

To reasonably determine that the improvement in air quality observed in Milwaukee-Racine was caused by permanent and enforceable measures, Resp. 32, the Agency would first need to identify the effect of those measures on precursor emissions in Milwaukee-Racine, during that improvement. EPA did not make that identification in this record.

EPA purports – at most – to have assessed reductions from some regulations, admitting that for others, it only "noted generally that ... compliance requirements ... became effective during the attainment period." Resp. 42. *See* R.16-7 (stating, for each measure, that "it is not necessary ... to identify the portion of [the observed] reductions attributable to each individual control measure").

And even where the Agency claims to have identified the results of particular regulations, it failed to provide an evaluation: (a) sufficient to assess the regulation's effects on *Milwaukee-Racine* (b) between *2005 and 2008* (the period EPA chose to represent the necessary improvement in air quality, R.15) that (c) draws reasonable support from the *record*.

For example, EPA stated that Wisconsin's regulations governing existing and new power plants and industrial facilities caused "a 25 [ton-per-day] reduction [in nitrogen oxides] between 2003, a non-attainment year, and 2007, an attainment year," state-wide. R.16. But EPA did not determine what portion of those reductions occurred in *Milwaukee-Racine*, rather than elsewhere. *Id.*, R.123 (noting that program encompasses both Sheboygan and Milwaukee-Racine). And it did not determine what reductions occurred "*between 2005 and 2008*," Resp. 38 (emphasis added). R.17 (acknowledging some of the claimed 25 ton-per-day reduction preceded 2005, but that "implementation of these rules was phased in over time," creating unspecified "additional emission reductions" between 2005 and 2008), R.44.

The *record*, furthermore, provides nothing to suggest that Wisconsin's stationary-source regulations produced any significant reduction at all in nitrogen oxides between 2005 and 2008.[7] *Cf.* Resp. 41 (citing only proposed decision's conclusory statements). Many of those regulations were adopted in 2001, and achieved most of their targeted

[7] EPA cites nothing in the record explaining how it arrived at its 25 ton-per-day figure.

reductions before 2004 (when Milwaukee-Racine was nevertheless designated non-attainment). Wis. Admin. Code § NR428.05 (standards adopted in 2001, requiring most reductions in 2002 and only minor reductions between 2005 and 2008). The remainder took effect in 2009 – after ozone levels had declined to meet the standard. *Id.* § NR428.22(1) (setting May 2009 effective date). And altogether, the regulations allow power plants in Milwaukee-Racine to emit more than six times the nitrogen oxides that *all* stationary sources in the area produced in 2008 (and more than four times the emissions when the area was in non-attainment) R.393-4 – ruling those regulations out as the cause of Milwaukee-Racine's reduced 2008 stationary-source emissions.[8]

EPA did not identify the precursor reductions caused by any of the other regulations it cited as producing permanent and enforceable reductions from stationary sources.[9] The Agency's partial assessment –

[8] The record thus does indicate that non-regulatory measures were responsible for Milwaukee-Racine's lower 2008 precursor emissions. *See also* R.11 (Sheboygan County's ozone has increased to violate standard, despite regulations). *Cf.* Resp. 44 ("[N]othing in the record" suggests temporary conditions affected 2008 emissions).

[9] The other stationary-source regulations EPA cited were: "New Source Performance Standards," under 42 U.S.C. § 7411 (which do not decrease pollution, but apply when sources increase emissions); unspecified

untethered from the area being re-designated, the timeframe when the area attained the standard, and the record – is not a reasonable "estimate[] [of] the impact" of the listed regulations "on emissions that cause[d] ozone pollution," to fall below the standard in Milwaukee-Racine. Resp. 41.[10]

Rather, in the record and in its decision, EPA only determined the change in "actual emissions" of nitrogen oxides and volatile organics that happened to occur between 2005 and 2008. R.16. EPA relied upon the correlation between that change and the imposition of state and federal regulations to "demonstrat[e] permanent and enforceable

---

"National Emission Standards for Hazardous Air Pollutants," under 42 U.S.C. § 7412; and the "$NO_x$ SIP Call." R.44.

[10] The Agency cites other numbers, similarly disconnected from any analysis of effects on Milwaukee-Racine between 2005 and 2008. Resp. 41-2 (noting state- and nation-wide percentage reductions, some "phased in between 2004 and 2009"). EPA also argues that because it provided 'percentages' in its discussion of some regulations, it has satisfied the requirements of its interpretative guidance (the Calcagni Memorandum). Resp. 43. That Memorandum suggests that the necessary showing requires: (a) an estimate of the percentage reduction achieved by all "control measures that have been adopted and implemented by the State" and EPA; (b) an effort to distinguish "temporary reductions" from "adverse economic conditions" or "unusually favorable meteorology"; and (c) that the result "clearly show that the air quality improvements are the result of implemented controls." R.86. EPA's analysis fails to meet any of those standards.

emissions reductions."[11] *Id. See* Resp. 50 (acknowledging that EPA "presume[d] that ... control measures" produced attainment, so that "states only need to show that permanent and enforceable rules are implementing those requirements").

But Milwaukee-Racine's change in 'actual' precursor emissions reflects influences beyond permanent, enforceable regulations – such as the adverse economic conditions that prevailed in 2008, weather, and everything else affecting industrial activity. Permanent, enforceable reductions were only a fraction of Milwaukee-Racine's "actual" reductions. Yet EPA did not distinguish the precursor reductions that were permanent and enforceable from those that were not. Instead the Agency assumed that all reductions in precursor emissions between 2005 and 2008 were caused by 'permanent and enforceable' measures.

---

[11] Those 'actual' reductions exceeded those EPA supposedly connected to permanent, enforceable measures. As noted, for stationary sources the Agency claimed to quantify only nitrogen oxides reductions from Wisconsin's stationary-source rules. It claimed a reduction of 25 tons per day across *both* Milwaukee-Racine and Sheboygan, during the *five* years between 2003 and 2008. Actual emissions of nitrogen oxides from stationary sources fell by more than 25 tons per day *just* in Milwaukee-Racine, during the *three* years between 2005 and 2008 (the period EPA chose to represent the requisite improvement in air quality). R.45.

R.16. The record provides no support for that assumption. *See* Section II, below.

### *B. EPA Never Determined the Ozone Levels Resulting from Permanent, Enforceable Measures in Milwaukee-Racine.*

To rationally attribute Milwaukee-Racine's decrease in ozone pollution between 2005 and 2008 to the federal and state measures EPA mentioned in its decision, the Agency would next have to determine the improvement in *ozone* levels resulting from whatever reductions in ozone *precursors* those permanent, enforceable measures produced. As this Court and EPA have recognized, ozone levels depend not just on the raw quantity of nitrogen oxides and volatile organics in an area – but also upon the location and timing of those precursor emissions, and the weather. *New York v. EPA,* 133 F.3d 987, 989 (7th Cir. 1998); 75 Fed. Reg. at 28,846.

EPA only compared the total quantity of precursor emissions that occurred within Milwaukee-Racine in 2005 with that which occurred in 2008. R.15 (Agency "demonstrate[d] permanent and enforceable emissions reductions by comparing nonattainment area emissions occurring during the nonattainment period," using 2005 as a "representative year," with "emissions in the area during the

attainment period," using 2008 as a representative year), R.16 (making comparison in Table 4).

Even if EPA had determined which precursor reductions resulted from federal and state regulations (which it did not), such aggregate precursor "growth and reduction calculations" would not allow the Agency to identify the effect of those regulations on ozone pollution in Milwaukee-Racine. 75 Fed. Reg. at 24,846. Because ozone formation depends on weather, geography, and the presence of other precursors, location and timing matter. *Id.* Winter and summer reductions have different effects. 76 Fed. Reg. 48,208, 48,222 (Aug. 8, 2011) (noting importance of "local and time-specific factors"). Precursor reductions in some places can cause ozone to increase rather than decrease. *New York,* 133 F.3d at 989.

Accordingly, to determine the regulations' impact on ozone pollution, the Agency needed to determine "the total effect on ozone" of the "reduction" resulting from those regulations, "and the geographical incidence of that effect" – a "tricky business" which EPA made no effort to undertake. *Id.* While EPA notes the deference due to "technical modeling requirements," Resp. 47, this record contains no analysis of

the relationship between ozone precursors and ozone formation – via modeling or otherwise – that might earn such deference. *See* Resp. 45-7 (citing only EPA's conclusory statements that reductions 'resulted from' the measures EPA noted).

EPA also asks the Court to defer to its "plausible interpretation" of the statute. Resp. 48. But the Agency offers no textual 'interpretation' that would allow it to avoid determining whether Milwaukee-Racine's improved ozone pollution resulted from the regulations the Agency listed. *See Schane v. Int'l Bhd. of Teamsters Local No. 710 Pension Fund Plan,* 13-3745, 2014 WL 3611613 (7th Cir. July 23, 2014) (reversal appropriate where "there simply is no analysis … to which the Court may defer"). Rather, EPA accepts that the Act requires that it "reasonably attribute the improvement in air quality [permitting re-designation] to emission reductions [that] are permanent and enforceable." Resp. 47 (quoting Calcagni Memorandum, R.86). *Accord* R.17. Consequently, EPA cannot escape the obligation both to reach that necessary conclusion, and to provide "a 'rational connection between the facts found and the choice made.'" *Bluewater Network,* 370 F.3d at 21 (citation omitted). Absent something in the record that

evaluates the effect of permanent and enforceable measures on *ozone* – not just nitrogen oxides and volatile organics – EPA's decision lacks that rational connection.

*C. EPA Could Not Assume that Observed Reductions in Milwaukee-Racine's Ozone Were Caused by Permanent, Enforceable Measures*

In its decision, and in the record, EPA offered only the following basis for its conclusion that Milwaukee-Racine's improved air quality was permanent and enforceable: it "demonstrate[d] permanent and enforceable emissions reductions [in ozone] by comparing nonattainment area [precursor] emissions … during the nonattainment period [2005] with emissions in the area during the attainment period [2008]," R.16; and it cited "a number of permanent and enforceable regulatory control measures which have been implemented" while precursor emissions fell, R.17.

That mere correlation – between (1) standard-attaining ozone levels, (2) an observed decrease in nitrogen oxides and volatile organics between 2005 and 2008, and (3) the adoption of state and federal regulations – does not suffice to establish the statutorily required causal connection between improved ozone levels and permanent, enforceable measures. Such a correlation could only establish causation

if the Agency had shown that "other variables are ... insignificant." *Radue,* 219 F.3d at 616-17.

Here, *precursor* emissions are affected by other factors – including economic demand, fuel pricing, and industrial activity. The Agency did not distinguish the effects of such temporary, unenforceable influences from those of permanent, enforceable regulations. *See* R.86 (attribution requires differentiation between improvement "resulting from temporary reductions in emissions rate" and effect of "permanent and enforceable" measures). And *ozone* pollution depends upon yet additional variables – location, timing, and weather, 75 Fed. Reg. at 24,846 – which EPA likewise did not address.

The Agency claims it had no "information" to suggest that adverse economic conditions (or anything else temporarily affecting pollution) prevailed in 2008. R.39, 44. However plausible that might be, it mistakes the Agency's burden. The statute demands a causal connection between permanent, enforceable measures and Milwaukee-Racine's improved air quality. 42 U.S.C. § 7407(d)(3)(E)(iii). *See Sierra Club v. EPA,* 375 F.3d 537, 538-39 (7th Cir. 2004) (noting importance of determination). To make that connection based only on the correlation

EPA identified – between standard-attaining ozone levels, reduced precursor emissions, and the adoption of regulations – EPA needed some rational basis to conclude that "other variables are … insignificant." *Radue,* 219 F.3d at 616-17.

This record lacks any such basis. EPA need not "conduct [any specific] analyses [that] Petitioner [might] prefer," Resp. 6. But it does need to reasonably determine that the areas' "improvement in air quality" resulted from "permanent and enforceable" measures, 42 U.S.C. § 7407(d)(3)(E)(iii), without "entirely fail[ing] to consider an important aspect of the problem." *Adventist GlenOaks,* 663 F.3d at 942.

The Agency did not do so here. Despite the "worst economic recession since the 1930s," Alan S. Blinder, After the Music Stopped: The Financial Crisis, the Response, and the Work Ahead (2013) at xv, EPA deliberately disregarded "underlying economic conditions," as "not relevant to the limited inquiry" by which it established causation. R.4. Despite the acknowledged importance of weather, timing, and geography to the formation of ozone, 75 Fed. Reg. at 24,846, the Agency excluded all such factors from its causal analysis. The Agency refused to consider these influences on ozone pollution, even while its

interpretative guidance specified "adverse economic conditions," and "meteorology," R.86, as "important aspects" of its determination, *Fox Television Studios v. F.C.C.,* 280 F.3d 1027, 1051, *opinion modified on reh'g*, 293 F.3d 537 (D.C. Cir. 2002) (citation omitted). EPA's assertion that the areas' improved air quality was "due to" and "result[ed] from … permanent and enforceable measures" was, consequently, arbitrary and capricious, 42 U.S.C. § 7407(d)(3)(E)(iii). *Fox Television Studios*, 280 F.3d at 1051 (where agency fails to address considerations relevant to its decision, decision should be "reverse[d] as arbitrary and capricious" (citation omitted)).

### *D. EPA Did Not Establish a Causal Connection When Re-designating Chicago or St. Louis.*

As EPA acknowledges, its re-designations of Chicago and St. Louis were made on "similar" grounds to its re-designation of Milwaukee-Racine. Resp. 40. In each EPA asserted that the correlation between three events – the adoption of regulations, a drop in precursor emissions, and attainment of the standard – was sufficient to demonstrate that attainment was caused by those regulations. Opening 27-35. *See* Resp. 50 (admitting that EPA asked States "only … to show that permanent and enforceable rules are implementing" control

requirements). And the record for EPA's re-designations of St. Louis and Chicago, like the record for Milwaukee-Racine, contains nothing to support EPA's claim that it did more than establish that correlation, Resp. 40.

*(1)* EPA did not identify the effect of the *regulations* that were adopted in Chicago and St. Louis on *precursor emissions* in those areas. R.61, 75. The Agency included region- or nation-wide estimates of the percentage-reductions resulting from some of its cited regulations – but not all of them. R.62, 75. The Agency assessed the effect of those few regulations state- or nation-wide – but not on Chicago and St. Louis. *Id.* (noting, *e.g.*, that State rules would result in a "82 percent $NO_x$ reduction" at certain facilities state-wide, and that "Tier 2 Emission Standards" will result in various reductions "nationwide"). And EPA failed to determine what reductions occurred during the 2002-2008 period the Agency chose as "representative," R.6, of the areas' improved air quality. R.62, 75 (noting that for several regulations only "some of [the specified] emission reductions occurred by the attainment years," while unspecified additional portion occurred prior to 2002, or after 2009).

As in Milwaukee-Racine, EPA offered nothing to indicate that the various regulations it cited produced the precursor reductions that the Agency found sufficient to bring the areas into compliance with the ozone standard: the 2008 'actual' emissions levels EPA used to represent attainment. R.63, 76. *See* R.61, 75 (finding only that adoption of regulations coincided, in part, with period during which areas came into attainment). Accordingly, the Agency's claims regarding the impact of its cited regulations in Chicago and St. Louis were, as in Milwaukee-Racine, divorced from the area being re-designated, the time period during which the areas' air quality improved, and the record.

*(2)* EPA did not assess the drop in *ozone* that might have resulted from whatever 'permanent and enforceable' *precursor* reductions may have occurred in Chicago and St. Louis. It only "compared" the total aggregate, annual precursor emissions in the areas during non-attainment, and during attainment – without considering the geography or meteorology that determines the effect of precursor emissions on ozone concentrations. R.6, 26. Indeed, neither EPA nor Illinois even concluded that these in-area precursor reductions were sufficient to produce standard-attaining ozone levels in St. Louis or

Chicago. In both decisions, EPA stated, following Illinois' own analyses, that the areas' "improvement in air quality" was caused, in part, by precursor reductions in "upwind areas." R.6, 24.

*(3)* In both Chicago and St. Louis, EPA assumed that the areas' reduced precursor emissions resulted entirely from various regulatory measures, because (most of) the measures were adopted while those reductions occurred. But precursor emissions are affected by other, temporary influences, such as 2008's recession – and the Agency made no effort to account for those other factors. R.6, 24. In both Chicago and St. Louis, EPA also assumed that the areas' reduced ozone levels were the result of reduced aggregate precursor pollution. But ozone levels depend upon weather, geography, and timing – and the Agency made no effort to account for any of those factors. Consequently, as in Milwaukee-Racine, EPA failed to reasonably establish that Chicago's and St. Louis' "improvement in air quality" "result[ed] from" permanent and enforceable measures. 42 U.S.C. § 7407(d)(3)(E)(iii). *Adventist GlenOaks,* 663 F.3d at 942.

## IV. EPA Never Established That "Actual" Emissions Were Enforceable and Permanent.

EPA acknowledges that it "presumed" that large sources' actual 2008 emissions – whatever pollution they happened to emit that year – represented "permanent and enforceable" reductions from prior years. Resp. 50. It cites nothing in the record or its decision to reasonably support the conclusion that those 2008 emission levels either could be enforced, or were otherwise permanent. *See* Opening 58-62. Instead, the Agency contends that "no evidence in the record indicated that" they "would not be permanent or enforceable" – a roundabout way of saying that the record lacks any evidence at all as to the permanency or enforceability of those 2008 "emissions levels." Resp. 50. The absence of such record evidence removes any 'rational connection' between EPA's conclusion and the facts found. *See Nat'l Fuel Gas Supply Corp. v. F.E.R.C.,* 468 F.3d 831, 844 (D.C. Cir. 2006) (remanding agency decision where agency provides no evidence in record to support conclusion, but instead relies on "the absence of [contrary evidence]," because "[t]he Administrative Procedure Act does not tolerate that kind of truism as the basis for" agency action).

The Agency defends its decision primarily by: (a) mischaracterizing Sierra Club's argument as demanding a "one-to-one correlation" and use of maximum "allowable" emission rates; and, (b) suggesting that the use of such maximum rates would "gross[ly] overestimate[]" emissions. Resp. 49-50. But this petition does not demand the use of 'maximum capacity.' So long as the Agency provides "evidence" that sources cannot exceed a given emissions level, EPA may conclude that the resulting reductions are permanent and enforceable. Opening 58 (quoting Calcagni Memorandum, R.86). For example, EPA could provide technical constraints, or "historic peak levels," to conclude that some plants will not produce the maximum legally permissible pollution. *Id.*

Here, however, the Agency re-designated Milwaukee-Racine, Chicago, and St. Louis by characterizing a specific emissions level as permanent and enforceable: the actual pollution that emerged from plants' smokestacks during the 2008 calendar year. R.26, 16, 7. It provided no regulation or law by which that level could be enforced. And it provided no technical constraint, or other "evidence," R.86, indicating that plants could not exceed those levels in the future. *Id.* Even if "maximum capacity" would *poorly* estimate permanent and enforceable

reductions, that does not establish that 'actual 2008 emissions' *reasonably* estimate permanent, enforceable reductions. Resp. 49. In short: EPA may be able to justify using levels below 'maximum allowable' emissions, but it did not do so here, nor – more importantly – did it demonstrate that the 'actual' 2008 levels it chose were "permanent and enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii). *See Util. Air Regulatory Grp. v. EPA,* 134 S. Ct. 2427, 2445 (2014) (EPA may not "rewrit[e] unambiguous statutory terms" to serve its "bureaucratic policy goals").

The Agency provides a new memorandum (the "Berry Memo," S.R.1) purportedly supporting its decision, Resp. 51. But the Berry Memo says nothing about the "permanent and enforceable" reductions required by 42 U.S.C. § 7407(d)(3)(E)(iii); it addresses "maintenance demonstrations" required by 42 U.S.C. § 7505a. S.R. 1 (memo "provides guidance on the use of actual emissions in *maintenance demonstrations*" (emphasis added)). The provisions of the Act governing such maintenance demonstrations do not require that reductions be "permanent and enforceable," 42 U.S.C. § 7505a (containing neither word), reflecting Congress' expectation that EPA would confirm the

permanency and enforceability of the area's improved air quality prior to re-designation, 42 U.S.C. § 7407(d)(3)(E)(iii). Indeed, the Berry Memo explicitly distinguishes 'actual' emissions from 'enforceable' reductions, noting that "enforceable" emission rates are reflected by "maximum allowable emissions," not "actual emissions." S.R. 2-3 & n.3.

EPA itself did not offer the Berry Memo as support for any part of its determination that actual 2008 emissions in Milwaukee-Racine, Chicago, or St. Louis were "permanent and enforceable" under 42 U.S.C. § 7407(d)(3)(E)(iii). R.7, 16, & 26. Rather, it claimed that the "Calcagni Memorandum" contained its "longstanding practice and policy" justifying the use of actual emissions "to demonstrate permanent and enforceable emissions reductions." R.16 & n.8, 26 & n.4.[12] *See Bagdonas v. Dep't of Treasury,* 93 F.3d 422, 426 (7th Cir. 1996) (refusing to accept *post hoc* rationale). And the Calcagni Memorandum contradicts EPA's position. It states that the Agency "should assume that sources are operating at permitted levels (or

[12] EPA cited the Berry Memo only in its re-designation proposal for Chicago, on a list of "[a]dditional guidance," with only the Memo's title (addressing "Maintenance Demonstrations") to indicate its relevance. R.53.

historical peak levels) unless evidence is presented that such an assumption is unrealistic." R.86.

EPA also asserts that its prior interpretations of the word 'enforceable' are inapplicable, because they addressed source-permitting and plans implementing the Act's regional haze program. R.53. But the Agency offers no other intelligible understanding of the term "enforceable" in 42 U.S.C. § 7407(d)(3)(E)(iii) – rather, it seeks to read the word out of the statute entirely. *Id.* (arguing that "Berry Memo ... allows the use of actual emissions," rather than enforceable reductions). And the measures that EPA cites as permanent and enforceable include both source-permitting requirements, R.61, 75 (citing "consent decrees" arising from New Source Review enforcement actions[13]), and federal regulatory programs akin to the Regional Haze provisions, R.6, 16 (citing implementation plans for other federal programs). Given the Agency's reliance on those regulatory measures, EPA's understanding of how they are 'enforceable' remains relevant – especially in the absence of any other plausible statutory interpretation from the Agency. *See Loving v. IRS,* 742 F.3d 1013, 1017 (D.C. Cir. 2014) (agency's "use of

[13] http://www2.epa.gov/enforcement/illinois-power-company-and-dynegy-midwest-generation-settlement.

a term can be valuable information … about" both "ordinary usage" and "any specialized meaning that people in the field attach to that term").

Finally, EPA claims that Sierra Club's comments failed to suggest that "the use of allowable emissions instead of actual emissions ... would have made a meaningful analytical difference." Resp. 54. On the contrary, Sierra Club's comments calculated the emissions that would result if power plants in Milwaukee-Racine operated at the levels that are enforceable through existing laws and regulations. R.393-4. And it showed that at such enforceable levels, power plants *alone* emitted more than four times the nitrogen oxides emitted by all stationary sources in the area in 2005, the year EPA chose to represent the area's non-attainment. R.394. Use of 'enforceable' rather than 'actual' levels thus indicates that there has been no permanent, enforceable reduction at all from major stationary sources, and that such sources could – given better economic conditions than those of 2008 – increase their emissions to their non-attainment levels and beyond. *See* R.11 (noting that Sheboygan County returned to non-attainment, despite allegedly 'permanent and enforceable' reductions).

## V. THE NOx SIP CALL DOES NOT CREATE PERMANENT AND ENFORCEABLE REDUCTIONS IN THE AREAS.

EPA asserted, when re-designating Milwaukee-Racine, that the '$NO_x$ SIP Call' "resulted in lower concentrations of transported ozone entering the Milwaukee-Racine," area, and that these reductions were "permanent and enforceable." R.18. In Chicago and St. Louis, the Agency similarly claimed that the $NO_x$ SIP Call would produce "permanent and enforceable" reductions, R.5, 25, and that such reductions in "upwind areas" were responsible for each area's attainment of the ozone standard. R.6, 24.

But the $NO_x$ SIP Call permits trading across twenty-two states, whose emissions affect thirteen different non-attainment areas. 63 Fed. Reg. at 57,395. *See Michigan v. EPA,* 213 F.3d 663, 676 (D.C. Cir. 2000). It does not compel precursor reductions in any one location, or ozone improvements in any particular non-attainment area. *NRDC v. EPA,* 571 F.3d 1245, 1257 (D.C. Cir. 2009). For that reason – and contrary to EPA's decision, R.5, 18, 25 – the $NO_x$ SIP call does not create a permanent, enforceable improvement in ozone pollution in Milwaukee-Racine, Chicago, or St. Louis (or any other specific area). Opening 63-9.

*A. The $NO_x$ SIP Call Was Relevant to Re-designation.*

To escape defending its reliance on the $NO_x$ SIP Call, EPA claims that it only "cited," "mentioned," and "noted" that trading program "generally" – without having conclusively "relied on" the $NO_x$ SIP Call to *cause* the "reduction in ozone" necessary for re-designation. Resp. 60. That contrasts sharply with EPA's assertion, earlier in its Response, that it "estimated the impact that [the measures EPA listed] would have," including the $NO_x$ SIP Call, Resp. 41, and "determined that the reduction in emissions in these areas 'resulted from' ... the specific permanent and enforceable regulatory measures that it identified." Resp. 44-5. Here, EPA says it merely "cited several state and federal regulations," without specifically concluding that they were necessary to the areas' improved air quality. Resp. 60. And so, according to the Agency, the permanency and enforceability of any one of the regulations it "mentioned" is immaterial. *Id.*

EPA did not connect the results of the regulations listed in its decision, individually or collectively, to the areas' improved air quality. *See supra* at 17-29. The record contains nothing to identify the improvement in air quality attributable to any (or all) of the measures

EPA listed as responsible for the areas' attainment of the ozone standard. *Id*. That absence, itself unlawful, does not shield the Agency from enquiry into whether the measures it cited are, in truth, "permanent and enforceable." 42 U.S.C. § 7407(d)(3)(E)(iii).

In its decisions – even in response to petitioner's comments regarding the $NO_x$ SIP Call – EPA did not suggest that the $NO_x$ SIP Call (or any other regulation) was superfluous. The Agency firmly stated that the trading program "resulted in lower concentrations of transported ozone entering the [re-designated] area," in a manner that was "*relevant to these redesignation actions*." R.18 (emphasis added). *Accord* R.5, 7, 25, 61, 75. *See also* R.16 (asserting that "[u]nder the $NO_x$ SIP Call, ozone season $NO_x$ emissions were reduced by approximately 68,000 tons between 2005 and 2008," across the program's trading region). Having squarely asserted the relevancy of reductions from the $NO_x$ SIP Call to these areas' improved air quality, R.18, EPA may not now avoid review of whether they are "permanent and enforceable," *id.*

*B. The $NO_x$ SIP Call Is Regional, Not Area-Specific.*

EPA offers no plausible basis for its conclusion that ozone reductions due to the $NO_x$ SIP Call in Milwaukee-Racine, Chicago, and St. Louis

are permanent and enforceable. EPA suggests that Sierra Club objects to trading programs generally, threatening "any flexibility" and demanding reductions at "*each source*." Resp. 67-8. Not so. As EPA acknowledges, the $NO_x$ SIP Call is "permanent and enforceable" only "from a regional perspective," Resp. 68 (and its "cap" applies only to all twenty-two participating states "in the aggregate," Resp. 67).[14] Sierra Club objects only to EPA's claim that such a *regional* trading program – spanning twenty-two states and thirteen non-attainment areas – provides "permanent and enforceable" ozone reductions in *a specific area.*

Recognizing that the $NO_x$ SIP Call's trading program does not compel air quality improvements in any "specific downwind nonattainment area," *North Carolina v. EPA,* 531 F.3d 896, 908 (D.C. Cir. 2008), does not "undermine" a "cost-effective approach to combating regional pollution problems," Resp. 66. It only acknowledges that a

---

[14] *EPA v. Homer City Generation, L.P.,* 134 S. Ct. 1584, (2014), upheld a different trading program, crafted to focus more closely on particular contributions to areas' non-attainment. *See* 76 Fed. Reg. at 48,271 & 48,321. *See* Resp. 66-7. It holds that trading programs are sometimes permissible – which this petition does not contest. But nothing in *Homer City* suggests that the $NO_x$ SIP Call provides permanent, enforceable reductions in any specific non-attainment area.

program constructed to remedy "regional … problems," *id.*, does not guarantee localized results. *NRDC,* 571 F.3d at 1258. Trading programs that assure benefits in specific non-attainment areas can be designed, and have been implemented. *E.g.,* 71 Fed. Reg. 52,664, 52,665 (Sept. 6, 2006) (approving $NO_x$ trading program designed to reduce ozone pollution in Houston-Galveston-Brazoria non-attainment area). But the $NO_x$ SIP Call is not such a program. *North Carolina,* 531 F.3d at 908 (recognizing that program was not designed to provide area-specific benefits).

The Agency argues that its "consistent interpretative definitions of 'permanent' and 'enforceable' emission reductions are reasonable." Resp. 63-4. But EPA has offered no interpretation of the words 'permanent and enforceable' that would encompass regulations that create no permanent, enforceable reduction *in the area* being re-designated.[15] R.8. *See* 75 Fed. Reg. 26,118 (May 11, 2010) (without

[15] The Agency suggests that the words "permanent and enforceable" are "backwards looking." Resp. 63. The word "permanent" is not easily understood as 'backwards looking.' Merriam-Webster's Collegiate Dictionary (11th ed. 2009) 922 (permanent means "continuing or enduring without fundamental or marked change"). Regardless, EPA acknowledges that a regulation that only "temporarily improve[s] air quality" is not permanent or enforceable. Resp. 63.

statutory interpretation); 72 Fed. Reg. 27,425, 27,429 (May 16, 2007) (same); 70 Fed. Reg. 69,085, 69,090 (Nov. 14, 2005) (same). Having accepted the need to attribute *Milwaukee-Racine's, Chicago's, and St. Louis's* improved ozone levels to permanent and enforceable measures, Resp. 37, EPA cannot simultaneously suggest that the statutory text allows it to rely on permanent, enforceable reductions that might occur *somewhere else*. *Cf.* Resp. 60 (implying that any "federal regulation[]" is "permanent and enforceable"). It is not enough that a measure produce non-"ephemeral" reductions, Resp. 63 – it must produce those reductions *in the area being re-designated*.[16]

As the D.C. Circuit has held, EPA may not rely on the $NO_x$ SIP call, where the Clean Air Act demands reductions specific to a single geographic area. *NRDC v. EPA,* 571 F.3d at 1258. The Agency responds that the requirement addressed in *NRDC* was "area-specific." Resp. 70.

[16] 42 U.S.C. § 7407(d)(3)(E)(iii) can only be sensibly read to require "permanent and enforceable" air quality improvements in the area being re-designated. The prior sub-section specifies the improved air quality that must be connected to 'permanent and enforceable' measures: whatever improvement EPA identifies when it "determine[s] that *the area* has attained" the relevant standard. 42 U.S.C. § 7407(d)(3)(E)(i) (emphasis added). *See* Resp. 10 (acknowledging that subsections are "complementary").

But 42 U.S.C. § 7407(d)(3)(E) is no less area-specific; it demands "permanent and enforceable reductions" in the area being re-designated. *See* n.16*,* above. EPA claims that unlike the "requirement at issue in *NRDC*, [42 U.S.C. § 7407(d)(3)(E)] do[es] not require that all emission reductions occur within the nonattainment area." Resp. 71. But while precursor reductions need not occur in the non-attainment area, ozone improvements must – and the $NO_x$ SIP Call provides no "permanent" or "enforceable" benefits in any specific area. Opening 68.

EPA cites *NRDC*'s statement that "EPA might be able to reinstate" its reliance on the $NO_x$ SIP Call "with an appropriate technical analysis." Resp. 71 (citing 571 F.3d at 1258). But EPA has not provided any such 'technical analysis' here. The record includes no analysis (technical or otherwise) suggesting that the program caused any 'permanent and enforceable' improvement in Milwaukee-Racine's, Chicago's, or St. Louis's ozone levels. *See* 63 Fed. Reg. at 57,459-60 (noting that EPA never assessed "the location of particular emissions" that program would control); R.7, 18, 25 (acknowledging that sources may increase emissions by purchasing allowances); *North Carolina,* 531

F.3d at 908 (program's controls "do not correlate" with pollution in any "specific ... nonattainment area").[17]

Respectfully submitted on August 14, 2014,

By: /s/ Sanjay Narayan

Sanjay Narayan
Sierra Club Environmental Law Program
85 Second St., 2d Floor
San Francisco, California 94105
(415) 977-5769
sanjay.narayan@sierraclub.org

Robert Ukeiley
Law Office of Robert Ukeiley
255 Mountain Meadows Rd.
Boulder, CO 80302
(303) 442-4033
rukeiley@igc.org

David C. Bender
McGillivray Westerberg & Bender LLC
211 S. Paterson St., Suite 320
Madison, Wisconsin 53703
(608) 310-3560
bender@mwbattorneys.com

[17] Though *North Carolina* vacated a different program, Resp. 52, it held that unless EPA has "measure[d] each state's 'significant contribution' to downwind nonattainment," it cannot rely on a multi-state trading program where the Act requires it to "eliminate[] emissions" contributing to nonattainment in a specific geographic area. 531 F.3d at 908. And *North Carolina* confirmed that the $NO_x$ SIP Call provides "emissions controls that do not correlate directly with each state's relative contribution" to any "specific downwind nonattainment area." *Id.*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This reply brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as modified by this Court's order of July 2, 2014, because it contains 8,991 words, excluding the parts of the brief exempted by Fed. R. App. Proc. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

By: /s/ Sanjay Narayan
Sanjay Narayan
Attorney for Petitioner

Dated: August 14, 2014

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing filing was electronically filed with the Clerk of the United States Court of Appeals for the Seventh Circuit on August 14, 2014, using the CM/ECF system, which will send notification of said filing to the attorneys of record registered with the Court's CM/ECF system.

By: /s/ Sanjay Narayan
Sanjay Narayan
Attorney for Petitioner

Dated: August 14, 2014